UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ] | |
| | ] | |
| v. | ] | Cr. No. 05-10155-MLW |
| | ] | |
| THOMAS CABANA | ] | |

**DEFENDANT'S MOTION FOR
DOWNWARD DEPARTURE AND OR <u>BOOKER</u> VARIANCE**

The defendant, Thomas Cabana, through counsel, respectfully submits this motion in order to provide information to assist the Court in fashioning a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C § 3553(a) in light of <u>United States v. Booker</u>, 125 S. Ct. 738 (2005).  Mr. Cabana moves for a downward departure from the otherwise applicable advisory sentencing guidelines, based on a combination or aggregation of factors, each of which by itself might be insufficient to justify a departure pursuant to U.S.S.G. § 5K2.0.

In the alternative, Mr. Cabana files this motion in support of a sentence below the range that would result from application of the federal sentencing guidelines, pursuant to 18 U.S.C. § 3553 and the Supreme Court's decision in <u>Booker</u>.  This decision restored district courts' ability to fashion a sentence tailored to the individual circumstances of the case and defendant by requiring courts to consider factors other than the sentencing range prescribed by the United States Sentencing Guidelines.  Indeed, under Section 3553(a), courts are required to sentence below the range if such a sentence would be sufficient to achieve the purposes of punishment.

Specifically, Mr. Cabana requests that this Court sentence him to a three month period of incarceration with the Bureau of Prisons to be followed by a period of supervised release of three

years.  Further, as a special condition of supervised release, Mr. Cabana requests that he be placed

in home confinement with electronic monitoring for a period of nine months pursuant to U.S.S.G.§

5F1.2.

As grounds, Mr. Cabana requests that this Court, in sentencing him, consider the following:

A.    Mr. Cabana  has a minimal criminal history [1];

B.    At the time of the offenses, increasing business and financial pressures prompted Mr. Cabana to commit the acts he accepted responsibility for; these same pressures caused his wife to abuse alcohol;

C.    Mr. Cabana is a sixty-two year old man who  has had little or no regular medical care for a period of many years ;

D.    Mr. Cabana was cooperative with the investigation in this case from its inception and pled guilty to the offenses;

E.    Mr. Cabana is experiencing both personal and financial ruination and has lost most, if not all, of  his business and retirement assets built over a lifetime of legitimate employment.

In support Mr. Cabana shows as follows:

**I.    Introduction**

1.    On March 31, 2006, the defendant, Thomas Cabana, pled guilty to one count of

conspiracy in violation of 18 U.S.C § 371 and nine counts of bank fraud in violation of 18 U.S.C.

§ 1344.  A sentencing hearing has been scheduled for August 8, 2006.

_____

[1]Mr. Cabana is currently on probation (ten year period beginning on July 17, 2003) out of the Norfolk County Superior Court and he is being supervised by Probation Officer Stephen Koenig.  According to the Pretrial Services report provided to the court prior to the plea hearing, Mr. Cabana has been in compliance with all the conditions of his state court probation.  This Larceny case arose from Mr. Cabana and Ms. Smith selling one recreational vehicle, referenced in the federal case, outright without the knowledge or consent of the individual(s) who had consigned the vehicle to Trip Makers, Inc. for rental purposes under an agreement to share rental profits.  Mr. Cabana and Ms. Smith were found guilty after trial and were ordered to pay restitution as a condition of their probation.

## II.        Presentence investigation report

2.        Mr. Cabana  has a minimal prior criminal record, establishing a criminal history category (CHC) of I.  PSR ¶ 45 .  The presentence investigation report (PSR) establishes a base offense level (BOL) of 6 pursuant to U.S.S.G § 2F1.1(a)[2], with a 9-level increase for loss amount pursuant to U.S.S.G.§ 2F1.1(b)(1)(J) (loss amount between $350,000.00 and $500,000.00) and a 2-level increase for more than minimal planning pursuant to U.S.S.G.§ 2F1.1(b)(2)(A).  PSR ¶¶ 32-33. This results in an adjusted offense level of 17, for total offense level (TOL) of 14 after 3 levels are subtracted for acceptance of responsibility.  PSR ¶¶ 37-38.  The guideline sentencing range (GSR) at CHC I, TOL 14 is 15 to 21 months incarceration in the Bureau of Prisons.  PSR ¶ 87.

## III.        Loss Amount and Restitution

3.        At the plea hearing, Mr. Cabana agreed that the loss amount was $ 470, 477.06.  PSR ¶ 25.  Defense counsel has provided the probation department and the government with documentation regarding the appropriate restitution amount to be set as a part of sentencing in this case..

## IV.        Motion for Downward Departure and or <u>Booker</u> Variance

4.        Mr. Cabana  moves this Court for a downward departure on the basis of a combination or aggregation of factors, each of which by itself might be insufficient to justify a departure pursuant to U.S.S.G. § 5K2.0.

>  The commentary to [§] 5K2.0 further provides that even where various single circumstances, considered individually, might be insufficient to permit a finding that a case is outside the heartland of a particular guideline, the presence of those circumstances in combination might

---

[2]Since the offense conduct alleged in the indictment in this matter took place between 1998 and 2000, the United States Sentencing Guidelines Manual for the year 2000 is being applied to set the total offense level and the advisory guidelines sentencing range.

permit a different assessment:

The Commission does not foreclose the possibility of an extraordinary case that, because of a combination of ... characteristics or circumstances [that separately would not warrant departure], differs significantly from the "heartland" cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case. U.S.S.G. § 5K2.0, comment.

United States v. Lombard,  72 F.3d 170, 183 (1ˢᵗ Cir. 1995).

5.      In the alternative, Mr. Cabana moves this Court for a downward variance from the advisory federal sentencing guidelines, and requests that, pursuant to the Supreme Court's holding in United States v. Booker and United States v. Fanfan, 125 S. Ct. 738 (2005), he be sentenced in light of the various sentencing factors contained in 18 U.S.C. § 3553.[3]

6.      Mr. Cabana requests that this Court consider the following factors as support both for his motion for a downward departure and his motion for a Booker variance in this case.

---

[3] The sentencing factors which Booker/Fanfan require the district courts to consider include:
(1) the nature and circumstances of the offense and the history and
        characteristics of the defendant [§ 3553(a)(1)];
(2) the need for the sentence imposed-
        (A) to reflect the seriousness of the offense, to promote respect for the law, and to
             provide just punishment for the offense;
        (B) to afford adequate deterrence to criminal conduct;
        (C) to protect the public from further crimes of the defendant; and
        (D) to provide the defendant with needed educational or vocational training, medical
        care, or other correctional treatment in the most effective manner;
        [§ 3553(a)(2)]
(3) the kinds of sentences available [§3553(a)(3)];
(4) the guidelines and policy statements issued by the Sentencing
    Commission, including the (now non-mandatory) guideline range
     [§3553(a)(4) & (a)(5)];
(5) the need to avoid unwarranted sentencing disparity among
    defendants with similar records that have been found guilty of
     similar conduct [§ 3553(a)(6)]; and
(6) the need to provide restitution to any victims of the offense(s) [§ 3553(a)(7)].

**A.    Mr. Cabana has a minimal criminal record and these offenses represent a marked deviation from an otherwise law-abiding life.**

7.      Mr. Cabana is 62 years old  and has a minimal criminal record consisting of a related three count Larceny case out of the Norfolk Superior Court for which he was placed on probation. PSR ¶ 43.  Other than the three-year period framed by this offense (1998 to 2000) he has been a law-abiding citizen.  PSR ¶¶ 46-48.  He is not a drug user and does not abuse alcohol.  PSR ¶¶ 67-69 .

8.      Mr. Cabana is a veteran of the United States Air Force.  He served four years and was honorably discharged with a rank of private first class, E3.  While in the Air Force, he was trained as a combat medic and spent the majority of his time stationed at Pease Air Force Base in New Hampshire.  See United States Sentencing Guidelines § 5H1.11.

9.      After leaving the Air Force in 1966, Mr. Cabana married his first wife, Edna Green. Mr. Cabana got a job working at Dictaphone Corporation in Brookline, Massachusetts as a service technician.  He was with the company for a little over four years until about 1971.  He then worked briefly as an insurance salesman for Mutual of Omaha out of an office in Jamaica Plain and then as a car salesman for Tom Connolly Pontiac in Norwood, Massachusetts.  In 1973, Mr. Cabana became a student at Northeastern University.  He graduated from the university in 1976 with degree in business administration.  It was at Northeastern that he first met his current wife, Janet Smith who was also a student.  Mr. Cabana and Edna Green were divorced in 1977 after ten years of marriage; they had no children.  While attending Northeastern University, Mr. Cabana  worked 30-50 hours a week as an auto-mechanic for a Gulf service station in Norwood, Massachusetts.  After college, Mr. Cabana worked as a bookkeeper  at a real estate office, Gem Realty, in Boston, Massachusetts for a short  time.  After that, he began working in his preferred field of tax accounting and consulting

before heading into the recreational vehicle sales/rental business.  <u>See</u> United States Sentencing Guidelines § 5H1.2.

10.    Although Mr. Cabana  is not eligible for a downward departure pursuant to U.S.S.G. § 5K2.20, because it cannot be said that he committed a single transaction of limited duration, it can truly be said that these offenses "represent[] a marked deviation ... from an otherwise law-abiding life."  *See* U.S.S.G.§ 5K2.20(b).  It can also be said that, based on his age, past record , and the particular circumstances in this case, Mr. Cabana is unlikely to recidivate.  <u>United States v. Nellum</u>, 2005 WL 300073, 2005 U.S. Dist. LEXIS 1568 (N.D. Ind. Feb. 3, 2005) (Simon, J.) (post-<u>Booker</u> case, court departed downward where, *inter alia,* defendant unlikely to recidivate).

**B.  At the time of the offenses, personal financial problems prompted Mr. Cabana to engage in this fraudulent activity and tarnish the successful business he and Ms. Smith have built together.  The stress and anxiety created by the financial difficulty also caused Ms. Smith to abuse alcohol .**

11.     From 1991 through 2001, Trip Makers, Inc. borrowed a little over $19, 000, 000.00 from local banks and commercial finance companies for inventory financing or rental fleet financing. This money was borrowed to purchase 701 vehicles.  For 692 of those vehicles, the company paid off the loans.  For the remaining nine vehicles, Trip Makers did not fulfill this obligation.  Trip Makers obtained retail financing on behalf of its customers to pay for their recreational vehicle ("RV") purchases.  An estimated $20, 000, 000.00 in retail loan proceeds was entrusted to Trip Makers.  Trip Makers then had the responsibility of paying off the inventory financing and any outstanding loan balance that might exist on a trade unit.  With the exceptions of the loans outlined in the indictment in this case, the company fulfilled these obligations without incident.

12.     From 1991 through 2001, Trip Makers gross receipts from selling, servicing and

renting RV's was in excess of $30, 000, 000.00.  The company sold 898 RV's during that time.  Mr. Cabana and his wife received Top Ten Dealer Awards from Fleetwood Enterprises, Inc. ("Fleetwood") in eight of Trip Makers ten years as a Fleetwood RV dealer.  Mr. Cabana and his wife also received the Circle of Excellence Award from Fleetwood based on customer satisfaction surveys.  These are coveted awards within the RV retail industry and reflect Fleetwood's certification that a particular dealer has achieved a 100% customer satisfaction rating.  See attached letter of reference by Ferris W. Taylor, Exhibit A.

13.     Trip Makers therefore was a legitimate and successful business from its inception in 1986.  It was not until the period from 1998 to 2000 that the company began experiencing severe financial problems because of a decline in rental and sales revenue.  The fraudulent loans were obtained during that relatively brief time period in the life of the company  and vehicles were sold out of trust in a desperate,  misguided attempt to keep the company afloat through the year 2000.  Ultimately, the financial problems became so large that Trip Makers was forced into bankruptcy court at the end of 2000.  See Exhibit A.  Mr. Cabana and his wife did not and do not live a lavish lifestyle as result of using the proceeds of these fraudulent loans.  This was not done out of a sense of greed.  All of the money went directly back into the Trip Makers business in an effort to keep it alive.  Mr. Cabana and his wife are therefore distinguishable from defendant's in other fraud cases involving large sums of money being lost; they are really a couple of extremely average middle-class individuals who stubbornly, but mistakenly, pushed forward to save Trip Makers.  Given Mr. Cabana's background, the likelihood is that no criminal conduct in the form of taking fraudulent loans would have occurred but for Trip Maker's financial problems.

14.     The eventual failure of Trip Makers exacerbated Janet Smith's long struggle with

-7-

alcoholism.  Mr. Cabana married Janet Smith in 1978 and describes the first ten years or so of the marriage as satisfying and "happy."  However, since the mid-eighties the marriage had become distant and strained.  It was during that time period that Mr. Cabana first began to notice that Janet Smith had issues with alcohol.  The substance abuse problem became even more evident during the time period when Trip Makers began experiencing financial problems.  Mr. Cabana saw that Janet Smith would drink more regularly and in greater amounts immediately after the work day and later at night.

15.    In an attempt to broach the issue of substance abuse and reach out to his wife, Mr. Cabana began gathering information on the subject by attending Alcoholics Anonymous meetings and bringing home the literature.  At one point in time Mr. Cabana noted that his wife was drinking a 1.5 liter container of wine per day.  The substance abuse issue reached a crescendo when Trip Makers went into bankruptcy and Janet Smith openly admitted that she had a problem with alcohol. Although their relationship had changed over the years from a marriage to a partnership based on shared financial needs and obligations, Mr. Cabana still attempted to reach out to his wife and help her with these issues both during and after the time that these offenses occurred.

**C.    Mr. Cabana is a sixty-two year old man that has avoided  medical treatment over the years.**

16.    The defendant's age may warrant a lower sentence if, because of his age, the resulting sentence is greater than necessary to reflect the seriousness of the offense.  See United States v. Lewis, 406 F.3d 11, 21-11 (1st Cir. 2005) (remanding for re-sentencing where district court expressed concern that the guideline sentence of 319 months amounted to a life sentence for a defendant who was 38 years old).  As to defendants over forty, the risk of recidivism drops dramatically, lessening

-8-

the need to protect the public from further crimes of the defendant under 18 U.S.C. § 3553 (a)(2)C. See United States Sentencing Commission, Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines at 12 ("Recidivism rates decline relatively consistently as age increases," from 35.5% under age 21, to 9.5% over age 50.), available at http://www.ussc.gov/publicat/Recidivism_General.pdf.

17.    Elderly offenders, whether or not seriously infirm, suffer greater punishment in prison because they are at risk of being preyed upon by younger inmates and lack social support.  See Correctional Health Care, Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates, U.S. Department of Justice, National Institute of Corrections (2004 ed.), http://www.nicic.org/Library/018735.

18.    Thus, though age and infirmity are discouraged bases for departure, they can be considered under 18 U.S.C. § 3553(a).  United States v. Ryder, 414 F.3d 908, 920 (8th Cir. 2005); United States v. Lata,; United States v. Thomas, 360 F.Supp.2d 238, 243 (D. Mass. Mar. 14, 2005); Simon v. United States, 361 F.Supp.2d 35 (E.D.N.Y. Mar. 17, 2005).

19.    Mr. Cabana's last physical examination by a doctor was in 1966 when he was in the United States Air Force.  The reason for the lack of medical attention can be attributed to a long standing distrust of medical doctors.  He reports  no hospitalizations over the years since he was discharged from the military.  Although he does not complain of any physical problems, other than a pain in his right ankle that he attributes to the beginnings of arthritis, he has been a long time smoker (currently smokes one -half pack per day) and has no real knowledge about his true health situation.

20.    If Mr. Cabana develops health problems after being sentenced to a prison term due

to his age and lack of knowledge about his general health, it does become a concern.  A defendant's

impaired health, whether he or she is elderly or not, is a greater burden on the federal prison system

as well as making incarceration a greater burden on the defendant, <u>Simon v. United States</u>, <u>supra</u>,

and needed medical care must be provided in "the most effective manner," 18 U.S.C. § 3553 (a)

(2)(D), which may well not be in prison.

      **D.    Mr. Cabana was cooperative with the investigation in this case and pled guilty to the offenses; he is sincerely remorseful for his criminal actions and will endeavor to make the victims whole again if he is able.**

21.    Mr. Cabana agreed to be interviewed by an agent of the Federal Bureau of

Investigation  and Assistant United States Attorney Victor Wild and admitted to his role in these

offenses.  He ultimately agreed to plead guilty to these offenses.   Mr. Cabana is ashamed of his

conduct and regrets that he felt it necessary to resort to these actions that eventually ruined what had

been a successful business.  Mr. Cabana is sincerely remorseful for his actions and will do whatever

he can to restore the victims in this case.

      **E.    Mr. Cabana has been personally and financially ruined due to the actions he took in relation to this case.**

22.    Thomas Cabana has been living at 3 Everett Lane in Foxboro, Massachusetts for the

last thirty-eight years. The deed to the property is in his name and it is he and his wife's only

remaining financial asset.  When Trip Makers officially shut its doors in 2001 after an attempt at

reorganization and then, ultimately, Chapter seven bankruptcy, Mr. Cabana and his wife's financial

situation went from bad to worse.  Every valuable asset related to the company was taken in the

bankruptcy and both Mr. Cabana and his wife were left with nothing in terms of any personal savings

or retirement funds.  To make ends meet, Mr. Cabana continued with the few clients he retained for

his tax consulting business, Foxboro Consulting, and he reports making about $30-35,000.00 per year.  Janet Smith got a part time retail job working at a local Home Depot and also works for a business started by a former business associate called RV Desktop in Rhode Island.  Mr. Cabana reports that they had a combined income of about $63,000.00 in 2005.

23.     The desperate attempt to save Trip Makers, which resulted in the criminal conduct Mr. Cabana accepted responsibility for, ruined him in terms of his finances and his personal reputation.  If both Mr. Cabana and his wife are sentenced to prison terms, there is a very good chance that they will lose their home of over thirty years.  Because of the many liens on their home, Mr. Cabana and his wife have no equity left on it.  PSR ¶ 78.  Mr. Cabana will be extremely lucky if he can continue to eke out a meaningful living with his tax consulting once his sentence, whatever it happens to be, is completed.  In addition, both his and Janet Smith's retirement outlook is bleak given the large amount of debts and liabilities they have incurred.  PSR ¶ 79.

## V.     Conclusion

24.     Mr. Cabana moves this Court for a downward departure, or, in the alternative, for a Booker variance below the advisory guideline range, based on the aforementioned facts and circumstances.  Mr. Cabana recognizes that, based solely on the loss amount and the impact his unlawful actions have had on the victims and their businesses, some period of imprisonment is warranted.  Mr. Cabana asks this Court to impose a sentence of three months of incarceration followed by a period of three years of supervised release with the special condition of nine  months of home detention pursuant to U.S.S.G. § 5F1.2.  Mr. Cabana is not afraid to lose his liberty, but he is very concerned about the impact his absence will have on Janet Smith and on his ability to keep his home.  A sentence involving a component of home detention will accomplish the punitive goals

of punishment while also addressing the mitigating issues present in the case. Specifically, such a sentence would allow Mr. Cabana to be a liberty to work and make restitution which would be a much more difficult proposition if any lengthy period of incarceration were imposed.

25.    No supporting memorandum accompanies this motion because the authorities are contained herein.

## VI.    Request for Relief

Wherefore, the defendant, Thomas Cabana, through counsel, respectfully requests that this Honorable Court grant the requested relief and such other relief as may be deemed just and equitable.

Dated this 26th day of July 2006, at Boston, Massachusetts.

Respectfully submitted,

_____
Oscar Cruz, Jr.
Assistant Federal Public Defender
BBO# 630813
408 Atlantic Avenue, 3rd Floor
Boston, MA 02110
(617) 223-8061

## Certificate of Service

I, Oscar Cruz, Jr., hereby certify that on July 26, 2006, this document filed through the ECF system will be sent electronically to the registered participant, Assistant United States Attorney Victor Wild, as identified on the Notice of Electronic Filing (NEF) and a paper copy will be sent to United States Probation Officer Susan Walls via fax.

_____
Oscar Cruz, Jr.

# EXHIBIT

# A



**ingenix, Inc.**
2525 Lake Park Blvd Salt Lake City UT 84120
(801) 982-3000 • Fax (801) 982-4000 •
www.ingenix.com

April 12, 2006

## RE:  Character Reference for Janet Smith and Tom Cabana

To Whom It May Concern:

I am writing on behalf of past New England business colleagues and now friends from a distance, Janet Smith and Tom Cabana.  I hope that what I have to provide will be of benefit in consideration of the sentencing proceedings currently underway.

As background, I first met and began working with Janet Smith in 1984 at Management Decision Systems (MDS).  Janet was a key consultant with MDS clients in the Public and Private Sector. Janet was dedicated to her client's success, so much so that after leaving MDS she was retained by a government client, Fannie Mae, to continue providing strategic and technical support for many years.  A client of that caliber would not choose to do business year after year if there was any doubt about Janet's character or integrity.

From the beginning in working with Janet, she was a caring and thoughtful individual and willing to give of her time and expertise to help colleagues.  Outside of work, MDS held an annual Holiday Auction to raise money for Ronald McDonald's House.  I bid for the annual tax preparation that Tom and Janet had donated.  I learned from the colleague who won the bid what a thorough and complete job they did in preparing their tax returns, even though they got nothing out of it except knowing that the money went to take care of families with children in need.

In 1988, after investigating Tom and Janet, of Foxboro Consulting Associates, I moved my business from Coopers & Lybrand to them for preparing my personal taxes each year.  I and a number of my friends still continue to use Tom and Janet for tax advice and filings.  I have found them to be very knowledgeable and current with respect to the tax code and complete and timely in the support of their customers.  I know all of us, as clients of theirs, have grown to appreciate the effort they make to provide thorough and timely tax services.

In the early 1990's I began my business relationship with Tom and Janet. They developed a business plan to expand Trip Makers from the small RV Rental operation it had been since 1984 to a "Full-Service" RV New and Used Sales, International Rental and Maintenance/Service business.

Their plan was to become an RV dealer which would enable them to buy RVs at wholesale prices and therefore make more profit on company owned Rental RVs. They also planned to sell RVs to individuals who would then consign the vehicles back to Trip Makers and place them in the Rental Fleet. This was called the "Owners Rental Program" or "ORP". The ORP allowed families to economically own and rent RV's.  At the same time, it was an opportunity for other individuals who just wanted to rent an RV or rent before buying an RV, also known as "Try before You Buy".

There was nothing fraudulent or illegal about any aspect of the business. It was a solid business concept fulfilling a variety of needs in the marketplace. I personally bought and placed 3 different RV's into the Trip Maker "ORP" fleet. I would not own and enjoy an RV today had it not been for Trip Makers and the business Tom and Janet started and built over many years.

I was involved in the business enough that I attended a number of year end parties with other RV owners in the ORP. I know there are many families who owe a debt of gratitude to Tom and Janet for the rental income Trip Makers generated to help them pay for the total cost of owning an RV and enjoy the pleasure themselves of the RV lifestyle.

I also attended a number of New England RV Shows in both Boston and Rhode Island to support major selling events. I had a chance to talk with dealers, RV buyer prospects and other RV owners to personally explain the advantages of the ORP that I had grown to appreciate. I also saw and heard the respect and high regard many RV manufacturers had for Tom and Janet personally and for Trip Makers. They were given many awards over the years as one of the Top 10 RV Dealerships and as a Circle of Excellence Dealer nationally.

On a more personal note, my oldest son worked part-time in high school and several summers during college for Trip Makers as a Shop Mechanic and Service Manager. He seriously considered an offer to join the company full-time, but marriage moved him to the West. I never heard of anything inappropriate or fraudulent from any RV owners, from my son who worked there, or from the many Trip Makers employees who I interfaced with over many years.

In the mid-90's, Trip Makers moved to a highly visible location on Route 1 in Walpole. At the same time, Trip Makers started to gain a strong international reputation, especially in Europe, with travel agents who booked RV vacations in the U.S. The business was growing at a rapid rate.

The problem was that Trip Makers grew too fast and was under capitalized. In trying to keep up, there were financing decisions that were made that should never have been made. I respect Tom and Janet for taking responsibility for those errors in judgment, but I certainly hope a fair and complete picture will be considered in any penalties that the Federal Court might impose upon them.

In late 2000, Janet and Tom let me know they had filed for Chapter 11 Bankruptcy in an attempt to reorganize Trip Makers and to restructure the finances of the company. I know the ensuing year was a very painful and difficult time for Janet and Tom. Neither Trip Makers nor Janet and Tom personally had the funds available to retain an experienced bankruptcy attorney. Mistakes were made in those proceedings that financially and legally hurt both Trip Makers and Janet and Tom.

Several final and critical observations:

1. Over the many years that I have known her, Janet has shown a very strong personal ethic and sense of right and wrong. When she resolved her issues in Massachusetts Superior Court, by agreeing to a restitution plan, she expressed her relief to me that she had the opportunity to make things right for the individuals involved in that proceeding. She and Tom worked tirelessly to make that happen.

2. It doesn't shock me that, rather than fight Court proceedings, because she can see that businesses have been injured, her ethic would be to accept responsibility, even if it not solely hers to own. There was money lost and Janet's character is one to accept the "consequences." Tom is more concerned about his wife, her character and her future, than he is his own well-being.

3. Most importantly, any charges like the ones I have heard and read that imply that Tom or Janet started this business from the beginning with the sole purpose of committing bank fraud could not be further from the truth.

This is my attempt to paint a helpful picture of the Tom Cabana and Janet Smith I have had the pleasure of working with for well over 20 years and have observed the valid efforts they have both made to build successful companies. I sincerely hope that those making decisions about their penalties, for whatever errors in judgment that might have been made, will recognize that they are not a threat to anyone. Janet has two current employers who respect and appreciate her hard work – as she has had for the entire time I've known her. Tom is always there to help those who use their services.

Feel free to contact me if I can do anything to assure that Tom and Janet are able to continue to contribute to the community as they have in the 20 years that I have worked with them.

Sincerely,

Ferris W. Taylor

Ferris W. Taylor
VP Strategic Marketing
Ingenix, Inc
2525 Lake Park Blvd
Salt Lake City, Utah 84120
(801) 982-3400